KAB

**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Cole Joseph Spencer, | No. CV 20-00385-PHX-DGC (CDB) |
| Plaintiff, | |
| v. | **ORDER** |
| Aaron Pew, et al., | |
| Defendants. | |

Plaintiff Cole Joseph Spencer, who is confined in the Arizona State Prison Complex-Yuma, brought this pro se civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 6.) Pending before the Court are: (1) a Motion for Summary Judgment on Behalf of Defendants Aaron Pew and Jacob Rozema (Doc. 55), which Plaintiff opposes (Doc. 116), and (2) Defendants Shall and Macklin's Motion for Summary Judgment (Doc. 106), which Plaintiff opposes (Doc. 127).[1]

**I.     Background**

In his First Amended Complaint, Plaintiff alleged as follows. On March 21, 2018 at 5:20 p.m., Plaintiff was pulled over by Mesa Police Officers Rozema and Pew. The officers, "without any provocation," proceeded to punch, kick, knee, strangle, and tase Plaintiff. (Doc. 6 at 5.) During the incident, Maricopa County Sheriff's Deputies Shall

---

[1] The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), regarding the requirements of both responses. (Doc. 58, 110.)

and Macklin responded and "aided and assist[ed] Pew and Rozema in the beating." (*Id.* at 8.) As a result, Plaintiff sustained a fractured orbital bone, fractured nose, lacerated nose, bruised vertebrae, swollen and sprained wrist, and numerous abrasions to his face, and he experiences ongoing vision problems. (*Id.* at 11.)

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Fourth Amendment excessive force claims against Pew, Rozema, Shall, and Macklin. (Doc. 9.) The Court dismissed the remaining claims and Defendants. (*Id.*)

All Defendants now seek summary judgment on the grounds that they did not violate Plaintiff's Fourth Amendment rights and that they are entitled to qualified immunity.

**II.    Legal Standards**

**A.    Summary Judgment**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material (a fact that might affect the outcome of the suit under the governing law), and that the dispute is genuine (the evidence must be sufficient for a reasonable jury to return a verdict for the nonmovant). *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968), but it must "come forward with specific facts showing that there is a genuine issue for trial," *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court must consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### B. Qualified Immunity

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, a court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case). The qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.

### C. Fourth Amendment Excessive Force

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

Under the Fourth Amendment reasonableness standard, a court considers certain objective factors and does not consider the defendant officer's intent or motivation. *See id.* at 397, 399 ("subjective concepts like 'malice' and 'sadism' have no proper place in [this] inquiry"). Further, the reasonableness of the use of force "must be judged from the perspective of a reasonable officer at the scene, rather than with the 20/20 vision of

hindsight." *Id.* at 396.  When determining whether the totality of the circumstances justifies the degree of force, the court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue [and] whether the suspect poses an immediate threat to the safety of the officers or others."  *Id.*  The inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id.* at 397 (citations omitted).

**III.    Pew and Rozema**

Defendants Pew and Rozema argue that they are entitled to qualified immunity because Plaintiff, while high on mind-altering drugs, was physically fighting with officers to avoid being arrested for a serious crime and there is no clearly established law demonstrating that officers are not permitted to use force in such a situation.

**A.    Facts**

Officer Pew and Officer Rozema were employed by the Mesa Police Department. (Doc. 56 ¶ 2; Doc. 119 ¶ 2.)  On March 21, 2018, they pulled over a vehicle for making an unsafe and illegal traffic maneuver.  (Doc. 56 ¶ 3; Doc. 119 ¶ 3.)  The driver pulled out of a driveway in front of the officers' squad car, and Officer Pew had to slam on his brakes to avoid hitting the vehicle.  (Doc. 56 ¶ 3; Doc. 119 ¶ 3.)  Plaintiff was the front-seat passenger.  (Doc. 56 ¶ 4; Doc. 119 ¶ 4.)  While speaking with the occupants of the vehicle, Officer Pew noticed that Plaintiff appeared to be extremely nervous.  (Doc. 56 ¶ 5.) Plaintiff was heavily sweating and seemed to be looking to a nearby residential area, and Pew thought Plaintiff might be looking for a potential escape route.  (*Id.*)  Plaintiff admits that he was nervous because he thought that Mesa Police Officers had a bad reputation and he was intimidated by them.  (Doc. 118-2 ¶¶ 5-6.)

Officer Rozema asked Plaintiff to identify himself.  (Doc. 56 ¶ 6; Doc. 119 ¶ 6.) Plaintiff identified himself as "Kenneth Cory."  (Doc. 56 ¶ 7; Doc. 119 ¶ 7.)  An onsite records check revealed that Plaintiff was lying about his identity, and it was later revealed that he was Cole Joseph Spencer.  (Doc. 56 ¶ 8; Doc. 119 ¶ 8.)  Realizing that Plaintiff had

given him a false name, Officer Rozema asked Plaintiff to exit the vehicle. (Doc. 56 ¶ 9; Doc. 119 ¶ 9.)

Officer Rozema informed Plaintiff that he was being placed under arrest for "false reporting" in violation of Arizona law. (Doc. 56 ¶ 10.) Plaintiff asserts that Rozema did not tell him the reason he was under arrest and that Rozema indicated that he knew Plaintiff had given him a false name. (Doc. 119 ¶ 10.)

Defendants assert that when Officer Rozema attempted to handcuff Plaintiff, Plaintiff quickly turned around, shoved Officer Rozema in the chest, and began to run away from the scene. (Doc. 56 ¶ 11.) Plaintiff asserts that he put his hands behind his back, but when Rozema said his real name, he "panicked" and "pushed Rozema with his left shoulder to create space between the two of them." (Doc. 119 ¶ 11.)

Officer Rozema asserts that he quickly caught up to Plaintiff and tackled him to the ground. (Doc. 56 ¶ 12.) Plaintiff asserts that he only created space and "did not run," so there was no need to catch up with him. (Doc. 119 ¶ 12.) Defendants assert that Plaintiff then flipped over onto his back and swung his fist at Officer Rozema's face several times and attempted to throw Officer Rozema off him. (Doc. 56 ¶ 13.) Plaintiff denies that he attempted to punch Officer Rozema. (Doc. 119 ¶ 13.)

Officer Pew then ran around the vehicle to assist Officer Rozema, leaving the vehicle's driver unsupervised. (Doc. 56 ¶ 14; Doc. 119 ¶ 14.) Officer Pew struck Plaintiff in the head in an attempt to subdue him, but this strike had no effect. (Doc. 56 ¶ 15.) Plaintiff asserts that Pew "delivered three kicks to [Plaintiff's] face and shoulder." (Doc. 119 ¶ 15.)

Defendants assert that they proceeded to wrestle with Plaintiff, attempting to get him in handcuffs, but Plaintiff continued to actively resist and fight with the officers. (Doc. 56 ¶ 16.) Plaintiff asserts that after he initially shoved Rozema, he was not resisting or fighting. (Doc. 119 ¶ 16.) Defendants assert that they repeatedly ordered Plaintiff to "give up his hands," but Plaintiff continued fighting to avoid being arrested. (Doc. 56 ¶ 16.) Plaintiff asserts that he told the officers that he could not give up his hands because

1  he had been tased four times and his hands and body were "locked up due to neuro-
2  muscular incapacitation." (Doc. 119 ¶ 16.)

3      Defendants assert that after wrestling with Plaintiff for roughly a minute, Officer
4  Pew again struck Plaintiff in the head, attempting to momentarily daze him so he could be
5  handcuffed. (Doc. 56 ¶ 17.) Defendants assert that Plaintiff was again unphased and
6  continued to aggressively fight with the officers. (*Id.*) Plaintiff asserts that he was not
7  fighting and was screaming in extreme distress. (Doc. 119 ¶ 17.)

8      Defendants assert that Officer Pew then tased Plaintiff in "probe" mode, hoping the
9  electric shock would subdue Plaintiff for a moment so that he could be handcuffed.
10 (Doc. 56 ¶ 18.) Plaintiff asserts that he was tased four times for a total of 19 seconds.
11 (Doc. 119 ¶ 18.) Defendants assert that the initial taser shock had no effect on Plaintiff.
12 (Doc. 56 ¶ 19.) Defendants assert that Plaintiff grabbed the taser's probes, ripped them off
13 his body, threw them to the side, and continued wrestling with the officers. (Doc. 56 ¶ 20.)
14 Plaintiff disputes this. (Doc. 119 ¶ 20.) Defendants assert that Pew then tased Plaintiff
15 approximately three more times in "drive-stun" mode, but these shocks again had no
16 discernable effect on Plaintiff and he continued to fight. (Doc. 56 ¶ 21.) Plaintiff asserts
17 that the taser was not in "drive-stun" mode and that he was not fighting. (Doc. 119 ¶ 21.)

18     Around this time, two Maricopa County Sheriff's deputies arrived on the scene to
19 assist Officers Pew and Rozema. (Doc. 56 ¶ 22.) Plaintiff asserts that the deputies arrived
20 before this. (Doc. 119 ¶ 21.) One of the deputies (Defendant Macklin) helped Officers
21 Pew and Rozema detain Plaintiff, while the other (Defendant Shall) kept an eye on the
22 vehicle's driver. (Doc. 56 ¶ 22.)

23     After approximately three-and-a-half minutes of wrestling with Plaintiff, the three
24 officers were able to handcuff him. (Doc. 56 ¶ 23; Doc. 119 ¶ 23.) Both Officers Pew and
25 Rozema were physically exhausted after this fight. (Doc. 56 ¶ 24; Doc. 119 ¶ 24.)

26     Given their experience in law enforcement, Defendants Pew and Rozema believed
27 that Plaintiff was under the influence of powerful drugs because he had an extremely high
28 pain tolerance and what seemed like superhuman strength. (Doc. 56 ¶ 25; Doc. 119 ¶ 25.)

It was later determined that Plaintiff was under the influence of methamphetamine and dimethyltryptamine (DMT). (Doc. 56 ¶ 26.) Officer Rozema asserts that Plaintiff later admitted he had smoked DMT about four minutes before this incident, which made him completely "out of it" (Doc. 56 ¶ 27), and that methamphetamine and heroin were later found in Plaintiff's backpack (Doc. 119 ¶ 28). Plaintiff asserts that he was not on drugs and never admitted to being on drugs (Doc. 119 ¶¶ 25-27), and that the backpack was not his (Doc. 119 ¶ 28).[2]

Plaintiff subsequently pleaded guilty to second-degree burglary, third-degree burglary, and aggravated assault. (Doc. 56 ¶ 28; Doc. 119 ¶ 28.)[3]

---

[2] Plaintiff submits medical records indicating that he told the emergency room doctor that he was "altered on a drug called DMT." (Doc. 118-12 at 2.) The report from the Mesa Fire Department also states "Pt was A&Ox4 answering questions and admitting to Methamphetamines. . . ." (Doc. 118-22.) The medical records indicate that Plaintiff's last substance use was methamphetamine and DMT on March 21, 2018. (Doc. 118-12 at 5.) Many of Plaintiff's medical records note "altered mental status" and "polysubstance abuse." (*See generally* Doc. 118-12; Doc. 118-32.) A nursing note two days after the incident indicates that Plaintiff presented with palpitations and concern of opiate withdrawal. (Doc. 118-32 at 2.) During his criminal sentencing on the assault charge, Plaintiff's attorney stated "It is clear that [Plaintiff] has a substance abuse issue and unfortunately, finds himself here." (Doc. 56-3 at 7.) The medical records reveal that multiple doctors noted that Plaintiff was on drugs at the time of the event, had an altered mental status, and had a history of drug abuse, including reporting that he currently abused drugs. The medical records also indicate that a drug screen was ordered.

Plaintiff asserts that he never told the fire department or doctors he was taking drugs, and that the police officers falsely reported this fact to the EMTs and hospital. But this claim is directly contradicted by medical records stating that Plaintiff himself revealed his drug use. Plaintiff does not produce any evidence other than his own statement to support his claim, and he has not included the hospital's toxicology screen in the documents he has provided. Given the overwhelming evidence of his drug use at the time of the incident, the Court finds that Plaintiff's bare claim to the contrary is not sufficient to create an issue of fact. As the Ninth Circuit has noted, "a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007).

[3] The factual basis underlying the aggravated assault plea was that on March 21, 2018 Plaintiff "pushed the [police officer] and made a movement." (Doc. 118-8 at 14.) Plaintiff admitted that as a result of the assault, the police officer sustained injuries to his

**B.   Discussion**

    **1.   Constitutional Violation**

        **i.   The Severity of the Crime at Issue**

Defendants assert that although Plaintiff was initially arrested for a relatively minor crime (false reporting), once he shoved and struck Officer Rozema he was being arrested for aggravated assault and resisting arrest, which are serious felonies justifying the use of physical force to restrain Plaintiff. There is no dispute that Plaintiff resisted arrest, and that he later pleaded guilty to aggravated assault based on this resistance. Accordingly, this factor weighs in favor of Defendants.

        **ii.   Whether Plaintiff Posed an Immediate Threat to the Safety of the Officers or Others**

"The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132-33 (9th Cir. 2019). Defendants argue that Plaintiff, as the initial aggressor, struck Officer Rozema in the face and proceeded to wrestle and fight the officers for roughly three-and-a-half minutes. Plaintiff contends that after he was on the ground he was not resisting. Plaintiff's assertion is plainly contradicted by the video evidence. The video of the incident shows that Plaintiff was struggling and refusing to submit both of his hands to be handcuffed despite the Officers repeated orders to allow them to handcuff him. Although Plaintiff argues that his actions were "involuntary" because he could not move his arm, this is not supported by the video. The video shows three large officers straining to get Plaintiff into a position where he could be successfully handcuffed, that Plaintiff is repeatedly not complying with the officer's orders, and that he is struggling against them. In short, the evidence shows that Plaintiff resisted the officers' attempts to handcuff him. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (when opposing parties tell two different stories, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts" in ruling on summary judgment).

---

hip and also multiple abrasions and cuts. (*Id.* at 15.) The factual basis applies to the moments before Plaintiff was tackled to the ground.

- 8 -

The video also shows that the officers used a significant degree of force in order to gain Plaintiff's compliance, including tasing Plaintiff several times, putting him a chokehold, slamming his head into gravel, and delivering blows to his head. Defendants assert that Plaintiff displayed a great amount of strength and his resistance posed a threat to the officers' safety.

Given the number of officers who were present and the amount of force used, the court cannot conclude as an undisputed fact that Plaintiff posed an immediate threat to safety that justified the force used. This is a factual issue for trial.

### iii. Whether Plaintiff was Actively Resisting Arrest or Attempting to Evade Arrest by Flight

Defendants assert that Plaintiff struck the arresting officer and began to run toward the nearby residential area, and, because of his drug use, was extremely difficult to detain. The evidence shows that Plaintiff actively resisted arrest, continued to struggle with the officers as they attempted to handcuff him, and did not comply with the officers' orders. This factor favors Defendants.

### 2. Clearly Established Law

Defendants next argue that the law was not clearly established that they could not use the force they used on Plaintiff.

The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991). For qualified immunity purposes, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right," and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation omitted). The purpose of qualified immunity is "to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

Defendants argue that the law did not clearly indicate that they could not use the force they used, and that several cases found officers justified in using serious force when suspects were intoxicated, belligerent, uncooperative, flight-prone, and physically aggressive towards arresting officers. The Court agrees that it is not clearly established that officers cannot use significant force when an arrestee actively resists arrest, shows unusual strength, and refuses to submit to handcuffing despite multiple orders to do so. *See Mattos v. Agarano*, 661 F.3d 443, 445-46 (9th Cir. 2011) (en banc) (officers entitled to qualified immunity where they tased a pregnant woman who committed minor offenses three times over the course of less than one minute because she did not immediately comply with their orders, even though the woman posed no threat to the officers, did not try to evade arrest or flee, and there were no other exigent circumstances; reasoning that not every reasonable official would have understood that the use of the taser in such circumstances was beyond debate); *Kisela v. Hughes*, __U.S. ___, 138 S.Ct. 1148, 1152 (2018) (clearly established rights should not be defined at a high level of generality and qualified immunity protects all but the plainly incompetent or those who *knowingly* violate the law) (citations omitted). Plaintiff cites no cases discussing the permissible degree of force allowed in attempting to gain a resisting arrestee's compliance with the application of handcuffs.[4]

---

[4] The Court finds the Ninth Circuit's recent decision in *Rice v. Morehouse*, No. 18-35459, 2021 WL 853301 (9th Cir. Mar. 8, 2021), to be distinguishable. Plaintiff in this case was not engaged in "mere passive resistance." *Id.* at *9.

The Court finds that Defendants Rozema and Pew are entitled to qualified immunity from the excessive force claims.

### IV. Macklin and Shall's Motion for Summary Judgment[5]

#### A. Facts

On Wednesday, March 21, 2018, Deputy Shall was traveling east on Broadway Road approaching the Loop 202 interchange when he observed a traffic stop being conducted by the Mesa Police Department. (Doc. 107 ¶ 1.) Deputy Shall observed that there were 2 Mesa officers in full uniform, one on each side of the vehicle. (*Id.* ¶ 2.) Deputy Shall asserts that as he passed the vehicle, which was stopped on the north side of the roadway facing west, he observed the passenger of the car jump out and run. (*Id.* ¶ 3.) The two officers gave chase. (Doc. 107 ¶ 4.) Plaintiff disputes that Shall witnessed this. (Doc. 129 ¶ 3.)

Deputy Shall made a u-turn and returned to where the car was stopped. (*Id.* ¶ 4.) He exited his vehicle and observed both officers on the ground with a suspect who was actively resisting their efforts to place him in custody. (*Id.* ¶¶ 5-6.) Plaintiff disputes that he was resisting. (Doc. 129 ¶ 6.) One of the Mesa officers called out to Deputy Shall asking him to keep an eye on the driver who was still seated behind the wheel of the stopped car. (Doc. 107 ¶ 7.)

Deputy Macklin arrived on scene and began to assist the two Mesa officers in gaining control of Plaintiff, who continued to struggle. (*Id.* ¶ 8.) Deputy Macklin held Plaintiff's legs down while the Mesa officers applied leg chains. (*Id.* ¶ 9.) Deputy Macklin did not deploy his Taser at any time during this interaction. (*Id.* ¶ 10.) Deputy Shall did not deploy his Taser. (*Id.*)

Deputies Shall and Macklin observed the Mesa officers use only standard tactical maneuvers to gain control of Plaintiff. (*Id.* ¶¶ 11-12.) Plaintiff disputes that the Mesa

---

[5] Plaintiff filed a Motion to Clarify Exhibits (Doc. 131) discussing how he organized his exhibits in his Response to this Motion for Summary Judgment. Because Plaintiff does not seek any action from the Court in the "Motion," the Motion will be denied as moot.

- 11 -

officers used only standard tactical maneuvers. (Doc. 129 ¶¶ 11-12.) At the time Deputies Shall and Macklin arrived on the scene, they did not have any information about the reason the Mesa officers were detaining Plaintiff; they only knew that Mesa officers were trying to detain him and he was actively resisting. (Doc. 107 ¶ 13.)

### B.    Discussion

Defendants Shall and Macklin argue that they are entitled to summary judgment because they did not violate Plaintiff's Fourth Amendment rights and they are entitled to qualified immunity

#### 1.    Defendant Shall

Based on the video from Defendant Shall's body camera, he did not use any force in the interaction with Plaintiff. Defendant Shall arrived on the scene, witnessed Plaintiff actively resisting Defendants Pew and Rozema's attempts to handcuff him, and immediately began supervising the driver of the vehicle. Although Defendant Shall was standing near the altercation, his attention was focused on the driver of the vehicle. Under the totality of circumstances, there is no evidence that Defendant Shall had sufficient information from which he could conclude that he should intervene in an excessive use of force. Summary judgment will be granted in favor of Defendant Shall as to the Fourth Amendment claim.

#### 2.    Defendant Macklin

Defendant Macklin arrived after Plaintiff was on the ground and Defendants Pew and Rozema were trying to gain control of him. Macklin witnessed Plaintiff failing to follow the other officers' orders and actively resisting arrest. Macklin did not know why Plaintiff was being arrested, but he reasonably could conclude that Plaintiff's crime was severe given his level of resistance. The Court's discussion of the remaining two *Graham* factors as applied to the conduct of Pew and Rozema applies equally to Macklin, as does its conclusion that the law did not clearly show that the amount of force used was excessive. Summary judgment will be granted in favor of Macklin on the basis of qualified immunity.

/ / /

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to the Motion for Summary Judgment on Behalf of Defendants Aaron Pew and Jacob Rozema (Doc. 55), Defendants Shall and Macklin's Motion for Summary Judgment (Doc. 106), and Plaintiff's Motion to Clarify Exhibits (Doc. 131).

(2) Plaintiff's Motion to Clarify Exhibits (Doc. 131) is **denied as moot**.

(3) The Motion for Summary Judgment on Behalf of Defendants Aaron Pew and Jacob Rozema (Doc. 55) is **granted**.

(4) Defendants Shall and Macklin's Motion for Summary Judgment (Doc. 106) is **granted**.

(5) This action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 11th day of March, 2021.

*David G. Campbell*

David G. Campbell
Senior United States District Judge